**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**MANASEH MAWUFEMOR MINTAH** | **Crim. Action No.: 24-827**<br>**Hon. Esther Salas**<br><br>**OPINION AND ORDER** |

**SALAS, DISTRICT JUDGE**

This comes before the Court on the Government's motions in limine. (D.E. Nos. 73 & 80). The Court conducted oral argument on those applications on September 8, 2026. For the reasons set forth on the record on that date, and as described herein, the Government's motions are **GRANTED-IN-PART and DENIED-IN-PART**.

## I. DISCUSSION

On August 5, 2026, the Government filed an application containing the following six motions in limine: (i) a motion for admission of certain evidence pursuant to Federal Rule of Evidence 404(b); (ii) a motion for admission of Defendant Mintah's proffer statements at trial pursuant to the terms of the parties' proffer agreement; (iii) a motion to preclude Defendant from offering evidence and argument designed to elicit jury nullification; (iv) a motion for admission of certified business records for their truth without the need for testimony from a records custodian; (v) a motion to permit Special Agent Savanah Ciciarelli to remain in the courtroom throughout the trial; and (vi) a motion to permit the government to file such additional motions as may be necessary. (*See generally* D.E. No. 73 ("Gov. Br.")). The Government subsequently withdrew the business records motion after counsel resolved the issue via stipulation. (D.E. No. 76).

Defendant filed his response to the Government's motions on August 19, 2026. (D.E. No. 79 ("Def. Br.")). On September 2, 2026, the Government filed a supplemental application seeking the admission of certain information pursuant to Federal Rule of Evidence 608(b). (D.E. No. 80).

After carefully considering the parties' submissions and conducting oral argument on the Government's requests, the Court is now ready to rule and will address each motion in turn.

**a. Motion for Admission of Evidence Pursuant to Rule 404(b)**

Under Federal Rule of Evidence 404(b), evidence of other crimes is "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," Fed. R. Evid. 404(b)(1), but "this evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," Fed. R. Evid. 404(b)(2). Relevant here, the United States Court of Appeals for the Third Circuit has held: "To be admissible under Rule 404(b), evidence of uncharged crimes or wrongs must (1) have a proper evidentiary purpose; (2) be relevant; (3) satisfy Rule 403; and (4) be accompanied by a limiting instruction (where requested) about the purpose for which the jury may consider it." *U.S. v. Green*, 617 F.3d 233, 249 (3d Cir. 2010) (citing *United States v. Butch,* 256 F.3d 171, 175 (3d Cir. 2001)); *accord U.S. v. Caldwell*, 760 F.3d 267, 277–78 (3d Cir. 2014). Courts often refer to these considerations as the *Huddleston* factors (or to the set of factors, collectively, as the *Huddleston* test), in reference to the United States Supreme Court's decision in *Huddleston v. U.S.*, 485 U.S. 681 (1988). *See U.S. v. Smith*, 725 F.3d 340, 344 (3d Cir. 2013) ("In determining the admissibility of prior bad acts evidence, a district court must analyze, under the familiar *Huddleston* test . . .").

With regard to the first *Huddleston* factor, "[a] proper purpose is one that is 'probative of a material issue other than character.'" *Green*, 617 F.3d at 250 (quoting *Huddleston*, 485 U.S. at

686). Moreover, the evidence "must fit 'into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged." *Id.* (quoting *United States v. Himelwright*, 42 F.3d 777, 782 (3d Cir. 1994)). "[T]he proffered evidence must be excluded if the proponent neglects or is unable to articulate this chain of inferences, and failure to exclude such evidence constitutes reversible error." *Caldwell*, 760 F.3d at 277 (citing *United States v. Sampson*, 980 F.2d 883, 888 (3d Cir. 1992)).

As for the second *Huddleston* factor, evidence is considered relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The Third Circuit has cautioned, however, that "'evidence that may be relevant for some purposes may be irrelevant for the purpose for which it is offered,' or only relevant in some impermissible way." *Id.* (quoting *United States v. Morley*, 199 F.3d 129, 133 (3d Cir.1999)). Thus, in the context of Rule 404(b), the Court must look to whether the evidence is relevant to the "proper purpose" that the Court identified during the first step of its analysis. *U.S. v. Davis*, 726 F.3d 434, 442 (3d Cir. 2013). Moreover, the evidence "must be relevant without requiring the factfinder to make a propensity inference." *Id.*

If the Government satisfies the "proper purpose" and "relevance" prongs, the third step of the *Huddleston* test requires the Court to "balance the probative value of the proffered evidence against its prejudicial effect under Rule 403." *Caldwell*, 760 F.3d at 283. In doing so, the Court remains mindful of certain guiding principles. First, the Court considers only "unfair prejudice", "that is, prejudice 'based on something other than the evidence's persuasive weight.'" *U.S. v. Bergrin*, 682 F.3d 261, 279 (3d Cir. 2012) (quoting *United States v. Cruz–Garcia*, 344 F.3d 951, 956 (9th Cir.2003) (citation modified); *U.S. v. Schneider*, 801 F.3d 186, 198 (3d Cir. 2015) (in the

context of Rule 403, "unfair prejudice means 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'") (citation omitted). Second, this is not a true balancing test, where the Court may exclude evidence if the scale tips ever-so-slightly in the direction of unfair prejudice. Rather, the Court may only exclude evidence if its probative value is "substantially outweighed" by a danger of unfair prejudice. Fed. R. Evid. 403. In any event, "[t]his balancing requires great care on the part of the district court, 'because few categories of evidence bring greater risk of prejudice to the accused under Rule 403.'" *Caldwell*, 760 F.3d at 277 (quoting Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:28, at 731 (4th ed.2013))

Fourth, the Court must issue a limiting instruction if the Defendant so requests. *Green*, 617 F.3d at 249. "If such a request is made, the court should provide the instruction at the time the evidence is admitted." *Caldwell*, 760 F.3d at 277.

Finally, the Third Circuit requires that the District Court make detailed findings, *on the record*, when conducting a Rule 404(b)(2) analysis:

> To ensure that protections afforded by Rule 404(b) are not ignored, we also require care and precision by the district court in ruling on the admission of prior act evidence for a non-propensity purpose. "The district court, if it admits the evidence, must . . . articulate reasons why the evidence also goes to show something other than character." *Sampson,* 980 F.2d at 888. "The reasoning should be detailed and on the record; a mere recitation of the purposes in Rule 404(b)(2) is insufficient." *Davis,* 726 F.3d at 442.

*Caldwell*, 760 F.3d at 277.

With these principals in mind, the Court separately considers each type of evidence that the Government seeks to introduce pursuant to Rule 404(b).

**i. Bank Account Closure Evidence**

The Government first seeks to "introduce evidence that contemporaneous with the charged conspiracy period, Mintah had several bank accounts that were closed by financial institutions because of suspicious activity and/or fraud" (the "Bank Account Closure Evidence"). (Gov. Br. at 9). For instance, "the Government expects that at least two bank witnesses will testify that accounts controlled by Mintah were closed due to suspicious activity." (*Id.* at 11). Regarding the proper, non-propensity purpose for that evidence, the Government contends that "it relates to Mintah's knowledge—or at a minimum, willful blindness—that the funds he received into the accounts he controlled . . . were from illicit purposes." (*Id.* at 9).

The Government acknowledges that the Bank Account Closure Evidence "may carry some risk of unfair prejudice to Mintah[,]" but only because, like all 404(b) evidence, it may invite the jury to make inferences about Defendant's character. (*Id.*). It argues, however, that the Bank Account Closure Evidence is "highly probative as to Mintah's knowledge and/or willful blindness to the nature of the funds he was receiving and transferring, which may well be the central issue of the trial[,]" (*id.* at 14–15), such that any unfair prejudice would be insufficient to trigger exclusion under Rule 403. (*Id.*). Finally, the Government argues that "the Court can cure any risk of unfair prejudice to Mintah by instructing the jury regarding the proper purposes of such evidence[.]" (*Id.* at 15).

Defendant argues that (1) the Government has not adequately established a proper, non-propensity purpose for this evidence; and (2) the evidence's prejudicial effect substantially outweighs any probative value. (Def. Br. at 2–3).

First, Defendant argues that "the Government has not articulated a sufficient chain of logical inferences connecting [the Bank Account Closure Evidence] to a non-propensity purpose."

(*Id.* at 2). Defendant contends that "the Government has not identified what made the prior account closures suspicious, whether those closures involved comparable conduct to the charged transactions, or whether Mr. Mintah was even aware of the specific reasons for the closures at the time they occurred." (*Id.* at 2–3). Without that foundation, Defendant argues, the evidence invites the jury to draw an inference that, because banks closed certain of Mr. Mintah's accounts in the past, Mr. Mintah must be a money launderer. (*Id.* at 3).

Second, Defendant argues that, even if the Government did establish that information regarding the past bank account closures had probative value, the evidence would still run afoul of Rule 403 as "[i]t suggests to the jury that third-party institutions—entities with no stake in this prosecution—independently concluded that Mr. Mintah engaged in wrongdoing. The jury is likely to treat these closures as authoritative determinations of guilt, when in fact banks close accounts for a wide range of reasons, often without investigation or individualized findings." (*Id.* at 3). Defendant further contends that a limiting instruction would be insufficient to cure this prejudice. Finally, Defendant argues that the Government should be required to make a "detailed proffer," outside the presence of the jury, before the Court admits any evidence, identifying "(1) the specific accounts that were closed; (2) the dates of the closures relative to the charged conspiracy period; (3) the specific reasons each institution gave for the closure; (4) whether those reasons involved conduct comparable to the charged offenses; and (5) what, if any, notice Mr. Mintah received about the reasons for each closure." (*Id.*). Defendant contends that the Government must make such a proffer to demonstrate that it is really using the Bank Account Closure Evidence for a non-propensity purpose.

After carefully considering the parties' written submissions, the Court directed the Government to make an evidentiary proffer regarding the Bank Account Closure Evidence during

oral argument. During that proffer, the Government represented that witnesses from TD Bank, Enterprise Bank, and Jeanne D'Arc Credit Union would testify about their investigations of accounts that Defendant maintained on behalf of himself and his business enterprise, Dazionking LLC, and their interactions with Defendant concerning those investigations.

With regard to the TD Bank account in question, the Government proffered that certain transactions led the bank to conduct a fraud investigation, during which an investigator reviewed the account, discussed the investigation with Defendant, and ultimately determined that the account should be closed because certain activity was "suspicious" and inconsistent with Defendant's stated business purpose for the account. The TD Bank representative advised Defendant about the account closure and the reasons therefor.

The Government's proffer concerning the Enterprise Bank account was similar. A fraud investigator at the bank flagged the account for review and transferred the matter to a local branch manager for further investigation. That bank manager reviewed the account and communicated directly with Defendant, before finding that certain transactions were suspicious and inconsistent with the business purpose of the account. The bank manager then notified Defendant about the account closure, and the reasons for that decision.

The proffer concerning Jeanne D'Arc Credit Union revealed substantially different facts. There, a fraud investigator flagged and reviewed Defendant's account for suspicious activity. The bank automatically closed the account, however, after Defendant overdrew it. The closure was not, therefore, fraud related, and it is unclear whether Defendant knew that the bank had investigated the account.

With the benefit of the Government's proffers, the Court will now evaluate the Bank Account Closure Evidence under the *Huddleston* factors. As to the first factor, the Court agrees

with the Government that a proper, "non-propensity" purpose of that evidence would be to demonstrate that Defendant "knew, or was willfully blind to the fact, that the funds he received in this case were from illicit sources." (Gov. Br. at 10). Turning to the second factor, the Court finds that the proposed testimony regarding Defendant's TD Bank and Enterprise Bank accounts would be highly relevant for that purpose, as bank representatives interacted directly with Defendant during their investigations and ultimately informed him of the reasons why his accounts were being closed. As for the third *Huddleston* factor, the Court agrees that the testimony in question brings with it the risk of some unfair prejudice; namely that jurors may view the banks' investigatory findings or their ultimate decisions to close Defendant's accounts as evidence of Defendant's guilt of the charged offenses. The Court does not believe, however, that any such undue prejudice would substantially outweigh the evidence's probative value. Moreover, the Court finds that it would be appropriate to issue a limiting instruction to the jury before exposing them to the Bank Account Closure Evidence, which will serve to lessen any prejudicial effect. The Court will, therefore, permit the Government to introduce evidence regarding the closures of Defendant's TD Bank and Enterprise Bank accounts, subject to the aforementioned limiting instruction. The Court notes that this finding is without prejudice to Defendant's ability to make an appropriate motion to exclude such evidence at the time the Government seeks to offer it.

The Court reaches the opposite conclusion, however, regarding Defendant's account with Jeanne D'Arc Credit Union. It is unclear whether Defendant was aware that the bank had investigated his account, let alone why. Moreover, it appears that the bank closed that account because of an overdraft, rather than any concerns of suspicious activity. The Court finds that the Government has not satisfied the second *Huddleston* factor with regard to the Jeanne D'Arc Credit

Union account, and it will not, therefore, permit the Government to introduce evidence regarding the closure of that account pursuant to Rule 404(b).

**ii. Tax Return Evidence**

The Government seeks "to elicit evidence that [Defendant's company] Dazionking did not disclose any gross receipts on its 2021 tax return despite the fact that approximately $1.2 million had been transferred to Dazionking bank accounts during that year" (the "Tax Return Evidence"). (Gov. Br. at 5). The Government argues that this "bespeaks Mintah's consciousness of his guilt of the charged offenses because if the money transfers were from lawful sources then Dazionking would not have chosen to conceal them" on its 2021 tax return. (*Id.*).

The Government advises that it "does not intend to elicit the . . . Tax Return Evidence to argue that, because Mintah was a tax cheat, he is the sort of person who would conspire to launder fraud proceeds[,]" and concedes that "[u]sing the evidence for that purpose would plainly violate Rule 404(b)(1)." (Gov. Br. at 13–14). "Rather, the Government intends to elicit the . . . Tax Return Evidence to prove, circumstantially, that Mintah knew the illicit source of Dazionking's funds, which he tried to hide. Therefore, the evidence is admissible for proper non-propensity purposes under Rule 404(b), including intent, knowledge, and absence of mistake." (*Id.* at 14).

As with the "Bank Account Closure Evidence," the Government acknowledges that the Tax Return Evidence "may carry some risk of unfair prejudice to Mintah[,]" but only because, like all 404(b) evidence, it may invite the jury to make inferences about Defendant's character. (*Id.*). It argues, however, that the Tax Return Evidence is "highly probative as to Mintah's knowledge and/or willful blindness to the nature of the funds he was receiving and transferring, which may well be the central issue of the trial[,]" (*id.* at 14–15), such that any unfair prejudice would be insufficient to trigger exclusion under Rule 403. (*Id.*). Finally, the Government argues that the

Court can cure any risk of unfair prejudice to Defendant by giving the jury an appropriate limiting instruction. (*Id.* at 15).

In his opposition, Defendant first argues that that "[e]vidence that a defendant failed to report income on a tax return is "paradigmatic character evidence: it suggests dishonesty, willingness to deceive the government, and a general disposition toward law-breaking." (Def. Br. at 4). Second, Defendant argues that the probative value of the Tax Return Evidence is speculative, and would require the jury to make several inferences, including (i) that Defendant prepared or reviewed the tax return; (ii) Defendant knew Dazionking had received $1.2 million; (iii) he consciously chose to omit that income from the return; and (iv) he did so because of his knowledge about the origin of the funds, as opposed to an accounting error, an effort at tax avoidance, or some other reason. (*Id.*). Third, Defendant argues that the unfair prejudice associated with the Tax Return Evidence substantially outweighs any probative value because: (i) it invites the jury to punish Defendant for uncharged tax fraud, regardless of whether the Government proves the money laundering charges; and (ii) the jury will likely impute tax fraud—an inherently dishonest behavior—as bearing directly on Defendant's character. Thus, the jury is likely to use the evidence for something beyond its probative value vis-à-vis the charged offenses, which is the very definition of "unfair prejudice." (*Id.* at 5). Defendant further contends that a limiting instruction is unlikely to cure such prejudice because the underlying evidence is inherently inflammatory. (*Id.*). Finally, Defendant argues that the Court should defer any decision on the Government's motion until after the defense has presented its case, as the probative value of the evidence may shift if, for instance, Defendant presents evidence suggesting that Dazionking was a legitimate business or that he relied on professional advice for the tax return in question. (*Id.* at 5–6).

As with the Bank Account Closure Evidence, the Court required the Government to make a proffer at oral argument concerning the Tax Return Evidence. In its proffer, the Government represented that it possesses records reflecting that (i) Defendant operated Dazionking, LLC as a sole-proprietorship; (ii) Defendant file a personal, self-prepared 2021 tax return that included a "Schedule C" for Dazionking, reflecting that the entity had zero gross receipts and a loss of $5,000,000 in expenses during that tax year, which entitled Defendant to claim a refund from the IRS; and (iii) Defendant actually received $1.2 million in either his personal accounts or those of Dazionking, LLC during tax year 2021, and yet did not reflect that income in the tax documents he submitted.

The Court will now evaluate the Tax Return Evidence under the *Huddleston* factors in light of the more fulsome record the parties made during oral argument. As to the first factor, the Court agrees with the Government that a proper, "non-propensity" purpose of that evidence is Defendant's knowledge regarding the sources of the $1.2 million in allegedly unreported income. Concerning the second *Huddleston* factor, the Court finds that the Tax Return Evidence is clearly relevant to that purpose, as the Government's proffer reflects: (i) that Defendant prepared the tax documents in question himself; (ii) that Defendant knew of the $1.2 million in income; and (iii) that Defendant nevertheless did not include that income when preparing or submitting his tax documents. With regard to the third factor, the Court acknowledges the real risk of unfair prejudice, as jurors may potentially use the Tax Return Evidence to gauge Defendant's character for truthfulness or, as Defendant suggests, seek to "punish" him in this action for uncharged tax offenses. As with the Bank Account Closure Evidence, however, the Court has no basis to find that any undue prejudice associated with the Tax Return Evidence would substantially outweigh that evidence's clear probative value. Moreover, the Court finds that it would be appropriate to

issue a limiting instruction to the jury before exposing them to the Tax Return Evidence, which will serve to lessen any prejudicial effect.

Based on the foregoing, the Court will permit the Government to introduce the Tax Return Evidence, subject to the aforementioned limiting instruction. The Court notes that this finding is without prejudice to Defendant's ability to make an appropriate motion to exclude such evidence at the time the Government seeks to offer it.

**b. Motion for Admission of Defendant's Proffer Statements**

On August 9, 2023, Defendant entered into a proffer agreement with the Government. (D.E. No. 73-2 (the "Proffer Agreement"). After signing that Proffer Agreement, Defendant and his attorney met with two Assistant United States Attorneys and several agents. The Government now argues that it "should be permitted to use the proffered statements [from that meeting] to cross-examine Mintah, should he testify, and to rebut any claims or arguments made by defense counsel that run contrary to the proffered statements." (Gov. Br. at 16). Essentially, the Government asks that the Court apply the plain terms of the Proffer Agreement, which permits the Government to use Defendant's statements against him in certain circumstances, including to "rebut any evidence or arguments offered on [Defendant's] behalf." (Proffer Agreement at 1).

Defendant does not dispute that the Proffer Agreement permits the Government to use his proffer statements to rebut any contradictory testimony, evidence, or arguments. (Def. Br. at 5). Rather, Defendant argues that the Court cannot simply grant the Government blanket permission to use those statements in advance. Instead, "the Court should require the Government to identify—outside the presence of the jury and contemporaneous with any alleged contradiction—the specific defense statement, argument, or evidence that purportedly contradicts the proffer, and the specific proffer statement the Government seeks to introduce in response." (*Id.* at 6).

The Court finds that Defendant has the better argument here. The Proffer Agreement, signed by both Defendant and his attorney, provides, in relevant part:

> 1. Should your client be prosecuted, no statements made by your client during the interview will be used against your client in the government's case-in-chief at trial or for purposes of sentencing, except as provided below.
>
> ***
>
> 4. The government may use your client's statements and any information provided by your client to cross-examine your client and to rebut any evidence or arguments offered on your client's behalf.

(Proffer Agreement at 1). Interpreting an identical waiver provision, the United States Court of Appeals for the Third Circuit previously "explained that [those waiver terms] are 'expansive,' and that they allow the use of proffer statements 'to rebut *any* evidence or arguments' offered on a defendant's behalf." *U.S. v. Raisley*, 466 Fed. Appx. 125, 130 (3d Cir. 2012) (quoting *United States v. Hardwick*, 544 F.3d 565, 570 (3d Cir.2008)) (citation modified). Indeed, after acknowledging that this waiver language "is not limited to the defendant's own testimony . . . but may extend to the defense's cross examination of other witnesses," the Third Circuit recently confirmed (in a precedential opinion) that waiver "extends further to opening statements where defense counsel affirmatively advances factual arguments inconsistent with the defendant's proffered admissions." *U.S. v. Tavares*, ____ F.4th _____ (3d Cir. 2026); No. 25-1489, 2026 WL 2388220, at *3 (3d Cir. Aug. 17, 2026).

In short, once a defendant "opens the door" by offering information that legitimately contradicts a statement made during his or her proffer (regardless of whether that information comes in the form of an attorney argument, via cross-examination of other witnesses, the presentation of contradictory evidence, or the defendant's own testimony), the waiver provision applies and allows the government to use the proffer to address the contradiction.

Here, the Court will have to evaluate each purported contradiction on a case-by-case basis, comparing the statements in question against the information Defendant provided in his proffer. Defendant is, of course, on notice that, should he or his counsel make any contradictory statements at trial—regardless of their form (and mindful of the Third Circuit's broad interpretation of the relevant waiver provision)—the Court must allow the Government to use Defendant's proffer statements in response. The Court will, therefore, **RESERVE** decision on this motion pending development of the trial record.

### c. Motion to Preclude Evidence and Argument Likely to Elicit Jury Nullification

The Government moves to preclude Defendant from providing evidence of or otherwise referencing topics designed to provoke juror nullification. (Gov. Br. at 22–27). The Government identifies two major categories of such information.

First, the Government seeks to preclude Defendant from referencing information regarding the consequences a conviction may have upon his family, or information that otherwise "may evoke sympathy[,]" including (1) Defendant's service in the U.S. Armed Forces; (2) Defendant's mother's serious health condition during the timeframe charged in the indictment; and (3) the fact that one of Defendant's daughters has a serious health condition. (*Id.* at 22–23). The Government argues that any such information would be irrelevant and prejudicial, and that Third Circuit precedent provides that jurors should *not* be influenced by what the consequences of their verdict may be. (*Id.* at 22).

Second, the Government asks the Court to preclude Defendant "from presenting evidence or argument that it was unfair for the Government to charge him, or that it would be unfair for the jury to find him guilty, because others were not charged or they faced less severe charges, or because other individuals were allegedly as culpable or more culpable than [him]." (*Id.* at 24).

The Government argues that its charging decisions are "unsuitable for review by a jury[,]" (*id.*), that evidence of those charging decisions would be inadmissible under Rule 403, (*id.* at 25), and that such evidence is irrelevant to whether Defendant is guilty of the charged offenses. (*Id.* at 26).

Defendant argues that the Government's request to prelude him from providing any evidence regarding his background is overbroad, as such evidence "can be relevant for multiple proper purposes, including humanizing the defendant, providing context for his actions, and supporting a defense theory." (Def. Br. at 7). Defendant further contends that information regarding his military service "may be relevant to his credibility, his understanding of following instructions, or his general character for law-abiding conduct—all proper subjects under Federal Rule of Evidence 404(a)(2)(A)." (*Id.*). Defendant suggests that the Government's motion is premature, and that the "proper course" would be "to address specific objections if and when the defense offers the evidence in a manner that invites jury nullification or impermissible sympathy[,]" and that the Court can give limiting instructions to ensure the jury does not use the evidence for improper purposes. (*Id.*).

With regard to the Government's charging decisions, Defendant argues that the motion is premature, as Defendant has not brought a selective prosecution motion or suggested that he may pursue such a theory at trial. (*Id.*). Defendant further contends that there may be circumstances where the Government's charging decisions are relevant, such as when the Government relies on testimony from an uncharged co-conspirator. In that case, Defendant "is entitled to cross-examine those witnesses about their deals and use such evidence to impeach their credibility and demonstrate bias." (*Id.*).

Here, the Court must determine, as a threshold matter, whether the evidence in question is relevant to the charged offenses. Pursuant to Rule 401, "[e]vidence is relevant if: (a) it has any

tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Based on the parties' submissions, the Court cannot find any plausible basis as to why Defendant's family's medical history (i.e., that of both his mother and daughter) might be probative of whether Defendant is guilty of the charged offenses. Indeed, at oral argument, defense counsel did not object to the Court excluding such evidence. Similarly, the Court finds that the Government's charging decisions, standing alone, are irrelevant to Defendant's guilt, and could therefore only serve to generate unfair prejudice. Defendant is correct, however, that, should any alleged co-conspirators testify against him, any deals those individuals made with the Government would be relevant to their credibility.

Finally, Defendant's record of military service, standing alone, likewise appears irrelevant to whether Defendant is guilty of the charged offenses. While Defendant may use it as evidence of positive character traits (e.g., a penchant for following rules and character for lawfulness) pursuant to Federal Rule of Evidence 404(a)(2)(A), the Government is correct that, should Defendant do so, the Government would then be permitted to counter with evidence of its own pursuant to the same Rule. Fed. R. Evid. 404(a)(2)(A) (stating that if the Court admits a defendant's evidence of his pertinent trait, "the prosecutor may offer evidence to rebut it.").

**d. Motion to Permit FBI Special Agent Savannah Ciciarelli to Remain in the Courtroom Throughout the Trial**

The Government has designated Special Agent Ciciarelli—the case agent for this matter—as its representative pursuant to Federal Rule of Evidence 615. It argues that Special Agent Ciciarelli should therefore be excluded from any witness sequestration order entered in this case. Defendant does not oppose this request.

Federal Rule of Evidence 615(a) provides, in relevant part:

> At a party's request, the court must order witnesses excluded from the courtroom so that they cannot hear other witnesses' testimony. Or the court may do so on its own. But this rule does not authorize excluding:
>
> **(1)** a party who is a natural person;
>
> **(2)** one officer or employee of a party that is not a natural person, if that officer or employee has been designated as the party's representative by its attorney;
>
> **(3)** any person whose presence a party shows to be essential to presenting the party's claim or defense; or
>
> **(4)** a person authorized by statute to be present.

As the Government has designated Special Agent Ciciarelli as its representative, the exception set forth in Federal Rule of Evidence 615(a)(2) applies. The Court will, therefore, grant the Government's motion and exclude Special Agent Ciciarelli from any witness sequestration order it enters in this case. *See U.S. v. Gonzalez*, 918 F.2d 1129, 1138 (3d Cir. 1990) (finding the district court did not abuse its discretion when it invoked the Rule 615(a)(2) exception to permit the case agent responsible for the investigation to remain in the courtroom despite the defendant's sequestration motion).

**e. <u>Motion to Allow Future Motions in Limine</u>**

The Government asks that the Court permit it to file additional motions in limine, as necessary and appropriate, during the course of trial. That request is **GRANTED**. Both the Government and Defendant may submit additional motions in limine to address issues that arise during trial.

**f. <u>Motion Regarding Allegedly Forged Law School Credentials</u>**

On September 2, 2026, the Government filed a supplemental motion in limine. (D.E. No. 80). The Government represents that, during a lawful search of Defendant's cell phone, it found text messages wherein Defendant asked a contact to create a forged law school transcript and

diploma in exchange for compensation. (*Id.* at 1). The Government represents that, while it appears Defendant received the forged transcript (containing 16 instances of forgery), it is unclear whether he ever received a forged law school diploma. (*Id.* at 1, n.1). The Government seeks leave to introduce that evidence, when cross-examining Defendant, to impeach his character for truthfulness, pursuant to Federal Rule of Evidence 608(b). The Government represents that it does not seek to present that information in its case-in-chief.

Federal Rule of Evidence 608(b) provides:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
>
> > **(1)** the witness; or
> >
> > **(2)** another witness whose character the witness being cross-examined has testified about.

Here, it is unclear whether Defendant will testify at trial. As such, any consideration of this motion would be premature. The Court will, therefore, **RESERVE** decision on this motion.

## II. CONCLUSION

Based upon the foregoing, it is on this 15th day of September, 2026,

**ORDERED** that the Government's motions in limine, (D.E. Nos. 73 & 80), are resolved as follows:

1. The Government's motion to present evidence pursuant to Federal Rule of Evidence 404(b) is **GRANTED-IN-PART** and **DENIED-IN-PART** as described herein;
2. The Court **RESERVES** decision regarding the use of Defendant's proffer statements pending developments at trial;

3. With regard to the Government's motion to preclude use of evidence concerning Defendants' family's medical history, Defendant's military service, and the Government's charging decisions, that motion is **GRANTED-IN-PART** as described herein. The Court **RESERVES** decision on certain aspects of that motion pending developments at trial;
4. The Government's motion to exclude Special Agent Ciciarelli from any witness sequestration order entered in this case is **GRANTED**;
5. The Government's motion for leave to file future motions in limine is **GRANTED**. Both the Government and Defendant may file additional motions in limine as necessary and appropriate as the trial progresses;
6. The Court **RESERVES** decision regarding the Government's ability to cross-examine Defendant with evidence of allegedly forged law school documents.

*s/ Esther Salas*
**Esther Salas, U.S.D.J.**